# EXHIBIT A

JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 601-6766
(310) 295-2385 (Fax)

E-FILED
3/3/2023 3:55 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
23CV412521
Reviewed By: B. Roman-Antunez

*Attorneys for Plaintiff and the Putative Class*

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| **JANE DOE I**, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>**BETTERHELP, INC**., a Delaware corporation, also d/b/a **COMPILE, INC**., also d/b/a **MYTHERAPIST**, also d/b/a **TEEN COUNSELING**, also d/b/a **FAITHFUL COUNSELING**, also d/b/a **PRIDE COUNSELING**, also d/b/a **ICOUNSELING**, also d/b/a **REGAIN**, also d/b/a **TERAPPEUTA**.<br><br>        Defendant. | CASE NO. 23CV412521 _____<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) **Invasion of Privacy—Intrusion into Private Matters;**<br>(2) **Invasion of Privacy and Violation of California Constitution, Art. 1, § 1;**<br>(3) **Violation of Confidentiality of Medical Information Act (CMIA), California Civil Code § 56.101;**<br>(4) **Violation of CMIA, California Civil Code § 56.10;**<br>(5) **Violation of California Invasion of Privacy Act (CIPA), Penal Code §§ 630, *et seq*.; and**<br>(6) **Violation of Business & Professions Code §§ 17200 *et seq*. (UCL)**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Jane Doe I ("Plaintiff"), on behalf of herself and all others similarly situated, by and through her attorneys of record, HammondLaw, P.C., complains and alleges the following, based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

## **INTRODUCTION**

1.     This is a privacy class action under California Code of Civil Procedure § 382 seeking damages (including but not limited to compensatory, statutory, and punitive damages), civil penalties, restitution, disgorgement of profits, declaratory relief, and reasonable attorney's fees and costs pursuant to California Business & Professions Code § 17203, Civil Code §§ 56.35, 56.36, Penal Code § 637.2, and Code of Civil Procedure § 1021.5 on behalf of the members of the class, as defined below.

2.     Defendant BetterHelp, Inc. (hereinafter, "BetterHelp" or "Defendant") is a "market leading direct-to-consumer ("D2C") mental health platform."[1] Defendant's online counseling and therapy services are provided via BetterHelp's network of over 30,000 licensed clinicians leveraging BetterHelp's platform for web, mobile app, phone, and text-based interactions.[2] In the most recent reported year, fiscal 2022 (52 weeks ending Dec. 31, 2022), BetterHelp had sales of over $1 billion.[3]

3.     Defendant has maintained and operated, and continues to maintain and operate, a website –www.betterhelp.com– through which its customers can, among other things, learn about BetterHelp's online counseling services (the "Service"), answer questions to determine the right therapist/treatment, and fill out Defendant's intake questionnaire for the Service.[4]

4.     When Plaintiff and other customers used Defendant's website in order to sign up for a Service and become a paying user (a "User"), they were required to fill out a questionnaire (the "Intake Questionnaire"), answering detailed questions regarding their mental health.

5.     Upon completing the Intake Questionnaire, Plaintiff and other customers were required to create an account for the Service by entering their name, email address, phone number, and emergency contact information.

6.     Plaintiff and the Class members were then required to enter their credit card information to become a User.

---

[1] BetterHelp Corporation, <u>Fiscal 2022 Annual Report</u>, Form 10-K, p. 4 (2022).
[2] *Id.* At p. 4.
[3] BetterHelp Corporation, <u>Fiscal 2022 Annual Report</u>, Form 10-K, p. F-41 (2022).
[4] BetterHelp Home Page, https://www.BetterHelp.com/ (last visited, March 2, 2023).

7.      BetterHelp then utilized the User's Reponses to the Intake Questionnaire to match the User with one of Defendant's more than 30,000 licensed therapists, who provided the Users with mental health therapy via video conferencing, text messaging, live chat, and audio calls.

8.      Unbeknownst to Plaintiff and the Class members, on information and belief, the answers they gave to certain questions on the Intake Questionnaire, along with their personal information and personal identifiers, were secretly disclosed to Meta Platforms, Inc. (formerly known as Facebook) ("Meta" or "Facebook"), an unauthorized third party.

9.      Through the Meta Pixel, a tracking tool intentionally incorporated by BetterHelp in its website source code or otherwise affirmatively permitted on its website by BetterHelp, for customers who signed up for the Service, including Plaintiff, Defendant disclosed individually identifying information and information regarding their medical history, mental and physical condition, and treatment (hereinafter "Medical Information"), to Meta, all without its customers' knowledge and/or consent.

10.     Thus, through its actions and practices, BetterHelp has disclosed and released Medical Information to Meta. This massive breach of confidentiality and privacy has, on information and belief, affected millions of Class Members in the state of California.

11.     Plaintiff brings this class action on behalf of herself and all natural persons residing in California who used Defendant's website to sign up for Defendant's Service and whose Medical Information was disclosed or transmitted to Meta or any other unauthorized third party  (hereinafter, "Class Members").

12.     BetterHelp's actions constitute an extreme invasion of Plaintiff's and Class Members' privacy.  BetterHelp's actions also violated common law, the California Constitution, and numerous state statutes.

## PARTIES

13.     Plaintiff Jane Doe I, is a citizen of California, residing in Carmel Valley, Monterey County, California. Plaintiff Jane Doe I used Defendant's website to sign up for Defendant's Service in or about November 2020. On information and belief, her Medical Information was disclosed to Meta without her knowledge, consent, or authorization.

14.     Defendant BetterHelp, Inc. is a Delaware Corporation. BetterHelp's principal place of business, as listed with the California Secretary of State, is 990 Villa Street, Mountain View, Santa Clara County, California 94041.

//

## **JURISDICTION**

15.     This Court has jurisdiction over Plaintiff's and Class Members' claims for compensatory damages, disgorgement of profits, and punitive damages arising from Defendant's invasion of privacy and violation of Article 1, Section 1 of the California Constitution.

16.     This Court has jurisdiction over Plaintiff's and Class Members' claims for nominal damages, actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs arising from Defendant's violation of the California Confidentiality of Medical Information Act, Cal. Civil Code §§ 56 *et seq.*

17.     This Court has jurisdiction over Plaintiff's and Class Members' claims for statutory damages of $5,000 per violation, or three times the amount of actual damages, arising from Defendant's violation of the California Invasion of Privacy Act, Penal Code §§ 630 *et seq.*

18.     This Court has jurisdiction over Plaintiff's and Class Members' claims for restitution and declaratory relief arising from Defendant's unlawful, unfair, and fraudulent business practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

19.     This Court has jurisdiction over Plaintiff's and Class Members' claims for reasonable attorneys' fees and costs pursuant to § 1021.5 of the California Code of Civil Procedure.

20.     This Court has personal jurisdiction over the parties because Defendant has continuously and systematically conducted business in the State of California. Likewise, Plaintiff is a California resident whose rights were violated in the State of California as a result of her contact with Defendant from and within California.

## **VENUE**

21.     Venue is proper in this Court pursuant to California Code of Civil Procedure § 395. Defendant is a foreign corporation and has designated with the California Secretary of State a principal place of business in Mountain View, Santa Clara County, California. Thus, venue is proper in Santa Clara County.

## **FACTUAL BACKGROUND**

***In Order for Plaintiff and Class Members to Sign up for Services on its Website, Defendant Required Them to Input Medical Information***

22.     Throughout the Class Period, Defendant maintained and operated websites (including www.BetterHelp.com), through which Defendant has encouraged and permitted consumers to apply for BetterHelp's Service.

23.     To begin the process of signing up for the Service, when a Class Member visited Defendant's website, she would be asked if she was looking for "Individual," "Couples," or "Teen" therapy. Having made her selection, she would then be asked a series of questions regarding her mental health, including "Have you been in therapy before", "Rate your physical health", "Are you experiencing depression," and whether she had previously been in therapy.

24.     Upon completing the Intake Questionnaire, a Class member would be prompted to create an account for the Service by entering her personal information, including her name, email address, phone number, and emergency contact information.

25.     Finally, the Class Member would be required to provide her credit card information to become a User.

26.     On information and belief, throughout the Class Period, the process of signing-up for the Service on Defendant's website has been substantially the same.

27.     Thus, in order to use Defendant's website to obtain a Service, Plaintiff and other Class Members were required by Defendant's website to enter confidential, private, and sensitive personal and health information into the website.

### *Defendant Repeatedly Made Deceptive Statements and Representations about Privacy*

*In Displaying HIPAA Seals on its Website, Defendant Signaled to Plaintiff and Class Members that Their Medical Information Would be Safeguarded and Not Disclosed to Unauthorized Third Parties*

28.     From September 2013 to December 2020, Defendant displayed HIPAA seals implying Defendant's purported compliance with HIPAA.

29.     By displaying HIPAA seals on every page of Defendant's sites, BetterHelp signaled and suggested to consumers that a government agency or other third party had reviewed Defendant's privacy and information security practices and determined that they met HIPAA's requirements.

30.     Defendant also represented to consumers that it was in fact "HIPAA certified," with its customer service representatives informing consumers that BetterHelp was HIPAA Certified.

31.     On information and belief, no government agency or other third party reviewed Defendant's information practices for compliance with HIPAA, let alone determined that the practices met the requirements of HIPAA. Nor was BetterHelp ever "HIPAA certified."

32.     In addition, on information and belief, hundreds of Defendant's therapists are not subject to HIPAA and the identifiable health information of Users who engage with those therapists is therefore not protected by HIPAA. Further, Defendant does not even know which of its therapists are, or are not, subject to HIPAA, and it does not know which data are, or are not, protected by that law.

*Defendant Made Numerous Deceptive Statements Concerning the Treatment of Responses to Intake Questionnaires*

33.     Defendant included numerous privacy assurances throughout its Intake Questionnaire.

34.     From a date unknown until November 2021, Defendant's websites displayed a banner at the top of each question in the Intake Questionnaire, explaining that Defendant was merely asking for "some general and *anonymous* background information about you and the issues you'd like to deal with in online therapy" (emphasis added) so that the individual completing the Questionnaire could be matched "with the most suitable therapist for you."

35.     As Plaintiff and other Class Members proceeded through the Intake Questionnaire, Defendant made additional periodic privacy assurances. From at least August 2017 to December 2020, Plaintiff or a Class Member reached the question as to whether they had taken medication, they were shown the statement: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor." In December 2020, Defendant changed the statement to read: "Rest assured – *this information* will stay private between you and your counselor." (emphasis on alteration added). And in January 2021, Defendant changed it again to state: "Rest assured – *your health information* will stay private between you and your counselor. (emphasis on alteration added). This latter version of the representation remained in use until September 2021, when it was removed altogether.

36.     In fact, on information and belief, contrary to Defendant's statements concerning the treatment of responses to Intake Questionnaires, Defendant collected, and disclosed to third parties, Users' responses to certain questions in the Intake Questionnaire such as: "Have you been in counseling or therapy before?"

***Defendant's Privacy Policy Falsely Claimed Limited Use and Disclosure of Consumers' Information***

37.     From August 2013 to November 2018, Defendant's privacy policies represented that it would use and disclose Users' email addresses, IP addresses, enrollment in the Service, and Intake Questionnaire responses for certain purposes, including to connect them with therapists and operate the Service. Notably, these privacy policies made no mention of using or disclosing this information for advertising purposes, and they said nothing about permitting third parties to use this information for their own purposes.

38.     In November 2018, Defendant updated the privacy policy to state affirmatively that it would use and disclose this information only for limited purposes, such as to operate and improve the Service. These limited purposes did not include using or disclosing the information for advertising or disclosing the information to third parties for their own purposes.

39.     Defendant revised its privacy policy again in September 2019, stating that it might *use* this medical information for advertising. But the policy continued to say that defendant would only *disclose* this medical information to third parties for certain stated limited purposes, which did not include advertising or the third parties' own purposes.

40.     In September 2020, Defendant revised the privacy policy yet again to state that it might both use and disclose Users' information for advertising. But, the privacy policy continued to claim that Defendant would disclose this information to third parties for only the stated limited purposes, which did not include third parties' own purposes.

41.     From August 2013 to June 2021, Defendant's privacy policies stated that it would use web beacons (including pixels) and cookies for limited purposes. These limited purposes did not include the use or disclosure of Users' medical information for advertising purposes, or the disclosure of this information for third parties' own purposes. As discussed below, these tools permitted Defendant and third parties, including Meta, to collect Plaintiff and Class Members' medical information, including what pages they visited and what information they inputted into Defendant's website (including Plaintiff or the Class Member's email address, IP address, and certain Intake Questionnaire responses).

***Defendant Secretly Disclosed, and Permitted Meta to Intercept, Plaintiff's and Class Members' Medical Information***

42.     Completely unbeknownst to Plaintiff and other Class Members, and continuing to the present, Medical Information that they communicated to Defendant through Defendant's website while signing up for the Service was intercepted by and/or disclosed to at least one unauthorized third party: Meta.

*Meta's Platform and the Meta Pixel*

43.     Meta operates the world's largest social media company.

44.     Meta maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Meta associates with personal identifiers including IP addresses and cookie identifiers.

45.     Facebook users are allowed only one account and must share the name they go by in everyday life.

46.     Meta also tracks non-users across the web through its widespread Internet marketing products and source code.

47.     Meta's revenue is derived almost entirely from selling targeted advertising to Facebook users on Facebook.com and to all internet users on non-Facebook sites that integrate Meta marketing source code on their websites.

48.     Meta sells advertising space by highlighting its ability to target users. Meta can target users so effectively because it tracks Facebook's users' activity both on and off its site. This allows Meta to draw inferences about users beyond what they explicitly disclose on their Facebook accounts. Meta compiles this information into a generalized dataset called "Core Audiences," to which advertisers can apply specific filters and parameters in order to generate a target audience for their advertisements.

49.     Advertisers are also able to build "Custom Audiences." Advertisers can use "customer lists, website or app traffic, or engagement across Facebook technologies, to create Custom Audiences of people who already know [their] business."[5] Moreover, Advertisers are able to use their Custom Audience to create a Lookalike Audience. To create a Lookalike Audience, Facebook "leverages information such as demographics, interests and behaviors from [the advertiser's source Custom Audience] to find new people who share similar qualities." Using a Lookalike Audience allows an advertiser to deliver its advertisements to an "audience of people who are similar to (or 'look like') [its] existing customers."[6]

50.     One method by which an Advertiser can create a Custom Audience, and consequently a Lookalike Audience, is from the Advertiser's website. In order to create a "website Custom Audience" an Advertiser's website must have an active Meta Pixel.[7]

51.     The Meta Pixel is offered to advertisers, like BetterHelp, to integrate into their websites. Once installed on a website, "the [P]ixel will log when someone takes an action on [that] website."[8] As Facebook explains, "[t]he Meta Pixel receives information about the actions, or events, that take place on

---

[5] Facebook, About Customer Audiences,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Jan. 18, 2023).

[6] Facebook, About Lookalike Audiences,
https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Jan. 18, 2023).

[7] Facebook, Create a Website Custom Audience,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited Jan. 18, 2023).

[8] Facebook, About Meta Pixel,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 18, 2023).

[an advertiser's] website."[9] Automatic events are a category of actions that the Meta Pixel collects and transmits from the website where it is installed without the advertiser being required to add any additional code.[10] The collection and transmission of automatic events is sufficient for an Advertiser to create a Custom Audience and, consequently, a Lookalike Audience. Advertisers are also able to select from a set of Standard events, predefined by Facebook, which can also be collected and transmitted by the Meta Pixel, including, for example, what content a visitor views, subscribes to, or purchases.[11] Finally, Advertisers are able to create their own "custom events" to be tracked and transmitted to Facebook by the Meta Pixel.[12]

52.     When a user accesses a website hosting a Meta Pixel, Facebook's software script surreptitiously directs the user's computing device to send a separate message to Facebook's servers. This second transmission, completely invisible and unknown to the user, contains the content of the original request sent to the host website ("GET request"), along with the data that the Meta Pixel was configured to collect ("POST request"). GET and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting. These transmissions are initiated by Meta code and concurrent with the communications to and from the host website.

53.     The Meta Pixel acts as a conduit of information, sending the information it collects to Meta through scripts running in the user's web browser. The information is sent in data packets labelled with personally identifiable information, including the user's IP address.

54.     Meta associates the information it obtains via Meta Pixel with other information regarding the user, using additional personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect. If the user has a Facebook account, these identifiers include the "c_user" IDs, which allow Meta to link data to a particular Facebook account, and "xs" cookies associated with a browsing session. For both Facebook account-holders and users who do not have a

---

[9] Facebook, About Automatic Events, https://www.facebook.com/business/help/1292598407460746?id=1205376682832142 (last visited Jan. 18, 2023).

[10] *Id.*

[11] Facebook, Specifications for Meta Pixel Standard Events, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jan. 18, 2023).

[12] Facebook, About Standard and Custom Website Events, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Jan. 18, 2023).

Facebook account, these identifiers also include cookies that Meta ties to their browser, such as "datr" and "fr" cookies.[13]

55.     The c-user cookie is a means of identification for Facebook users. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has a unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

56.     Any computer user can find the Facebook account associated with a particular c-user cookie. One simply needs to log-in to Facebook, then type www.facebook.com/[c-user cookie]. For example, the c-user cookie for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser will retrieve Mark Zuckerberg's Facebook page.

57.     The _datr cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users and non-users. Facebook keeps a record of every _datr cookie identifier associated with each of its users.

58.     The _fr cookie is a Facebook identifier that is an encrypted combination of the c_user and _datr cookies.

59.     Meta warns developers and those who incorporate the Meta Pixel into their website that the Meta Pixel is a personal identifier because it "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts."[14]

60.     The Meta Pixel also automatically captures and discloses the IP address of the user. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications. Individual homes and their occupants can be, and are, tracked and targeted with advertising using IP addresses. Thus, IP addresses are personally identifiable, particularly in combination with other information disclosed through the Meta Pixel.

*Defendant Disclosed Plaintiff's and Class Members' Medical Information to Meta*

61.     Starting on date unknown and continuing to the present, Defendant embedded the Meta Pixel on and throughout its website and transmitted Medical Information shared by Plaintiff and Class Members, without their consent, to Meta in accordance with the Meta Pixel's configuration.

---

[13] Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.
[14] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 18, 2023).

62.     BetterHelp installed the Meta Pixel on its website – www.BetterHelp.com. On information and belief, when a Plaintiff or another Class Member visited that website and completed the steps necessary to obtain BetterHelp's counseling Services, the Meta Pixel automatically caused the Plaintiff's or Class Member's personal identifiers, including email addresses, IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Meta, attached to the fact that the Plaintiff or Class Member had visited the website and the titles of the webpages the Plaintiff or Class Member visited.

63.     Because Defendant only collected email addresses from individuals seeking mental health therapy via the Service, disclosure of Plaintiff's or a Class Member's email address implicitly identified Plaintiff or the respective Class Member as one seeking and/or receiving mental health treatment via the Service. Thus, each such disclosure constituted a disclosure of Medical Information.

64.     Similarly, because Defendant disclosed Plaintiff's and Class Members' IP addresses and other personal identifiers, including their Facebook user IDs, in conjunction with other data about their enrolment in the Service and/or their Intake Questionnaire responses, each such disclosure constituted a disclosure of Medical Information.

65.     On information and belief, in addition to the "automatic events" that the Meta Pixel automatically collects and transmits from a website without the website owner or developer being required to add any additional code, Defendant intentionally configured the Meta Pixel on its website to track, collect, and disclose "custom events" such as a User's response to certain questions in the Intake Questionnaire such as: "Have you been in counseling or therapy before?"

66.     Thus, put simply, when Plaintiff or other Class Members used Defendant's website to obtain a Service from BetterHelp, their identities, personal identifiers, and health information (together their Medical Information) were disclosed to Meta.

67.     On information and belief, Defendant disclosed Plaintiff's and Class Members' Medical Information to Meta in order to permit Defendant to improve its marketing and advertising. Thus, Defendant used Plaintiff's and Class Members' Medical Information for its own marketing and advertising purposes.

68.     Moreover, on information and belief, Meta, and other third parties, used the Medical Information disclosed to them for their own purposes. Defendant did not contractually limit how Meta and other third parties could use and disclose the Medical Information they received from Defendant about Plaintiff and Class Members other than merely agreeing to those third parties' general terms of service, which either placed no restrictions on the third parties' use and disclosure of the information or specifically permitted the third parties to use the information for their own purposes.

***Defendant Used and Disclosed Plaintiff's and Class Members' Medical Information Without Plaintiff's or Class Members' Knowledge, Consent, Authorization, or Further Action***

69.     The tracking tools incorporated into, embedded in, or otherwise permitted on Defendant's website were invisible to Plaintiff and Class Members while using that website. The Meta Pixels on Defendant's website were seamlessly integrated into the website such that there was no reason for Plaintiff or any Class Member to be aware of or to discover their presence.

70.     Plaintiff and Class Members were shown no disclaimer or warning that their Medical Information would be collected and disclosed by a Pixel or other tracking tool.

71.     Plaintiff and Class Members were shown no disclaimer or warning that their Medical Information would be disclosed to any unauthorized third party without their express consent.

72.     Plaintiff and Class Members had no idea that their Medical Information was being collected and transmitted to an unauthorized third party.

73.     Because Plaintiff and Class Members had no idea of the presence of Meta Pixels on Defendant's website, or that their Medical Information would be collected and transmitted to Meta, they could not and did not consent to BetterHelp's conduct.

74.     Plaintiff and Class Members did not give consent or authorization for Defendant to disclose their Medical Information to Meta or to any third party for the third party's use or purposes.

***Plaintiff and Class Members Had a Reasonable Expectation of Privacy in the Medical Information they Provided to Defendant***

75.     Plaintiff and Class Members had a reasonable expectation of privacy in their Medical Information.

76.     Information such as the Medical Information provided by Plaintiff and other Class Members to Defendant is protected by California law under the Confidentiality of Medical Information Act (CMIA). Cal. Civ. Code §§ 56, *et seq.*

77.     Pursuant to Cal. Civ. Code § 56.05(i), "medical information," for the purposes of the CMIA is defined as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental health application information, mental or physical condition, or treatment." Section 56.06(i) further provides: "'Individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail

address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual."

78.     Information such as the Medical Information provided by Plaintiff and other Class Members to Defendant is also protected by the HIPAA Privacy Rule.

79.     The Health Insurance Portability and Accountability Act's Privacy Rule (HIPAA), 45 C.F.R. 160.103 *et seq.*, protects patient health information. HIPAA sets national standards for safeguarding "protected health information." For example, HIPAA limits the permissible uses of protected health information and prohibits disclosure of this information without explicit authorization. *See* 45 C.F.R. § 164.502. HIPAA also requires that covered entities, such as Defendant, implement appropriate safeguards to protect this information. *See* 45 C.F.R. § 164.530(c)(1).

80.     Thus, state and federal laws reinforce the social norms and general expectation that individually-identifiable health information is to be kept private and confidential.

81.     Accordingly, Plaintiff and Class Members had a reasonable expectation of privacy regarding their Medical Information.

82.     Defendant acknowledged that Plaintiff's and Class Members' Medical Information is sensitive. On information and belief, Defendant's customer service representatives have told and continue to tell consumers that their "name, age, address, *email, medical history*, conversations between you and your counselor" are "PHI" or "Protected Health Information." (emphasis added).

83.     Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares that individual's data.

84.     For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[15] Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[16]

---

[15] Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumerreports/ consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[16] Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information, PEW RESEARCH CENTER, (Nov. 15, 2019),

85.     And privacy law experts have expressed concerns about the disclosure to third parties of a users' sensitive medical information, in particular. For example, Dena Mendelsohn – the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs – explained that having one's personal health information disseminated in ways one is unaware of could have serious repercussions, including affecting one's ability to obtain life insurance and how much one pay for that coverage, increasing the rate one is charged on loans, and leaving one vulnerable to workplace discrimination.[17]

### *The Medical Information that Defendant Disclosed to Meta is Plaintiff's and Class Members' Property, Has Economic Value, and its Unauthorized Disclosure Caused Economic Harm*

86.     It is common knowledge that there is an economic market for consumers' personal data – including the Medical Information that was disclosed by Defendant to Meta.

87.     In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender, and location" information are sold for about "$0.50 per 1,000 people."[18] This estimate was based upon "industry pricing data viewed by the Financial Times," at the time.[19]

88.     In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[20] That same report noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[21]

89.     In 2021, a report from *Invisibly* found that personal medical information is one of the *most valuable pieces of data* within the data-market. "It's worth acknowledging that because health care records

---

https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confusedand-feeling-lack-of-control-over-their-personal-information/.

[17] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (Jan. 28, 2020), https://www.consumerreports.org/health-privacy/what-your-period-tracker-app-knows-about-you/.

[18] Emily Steel, et al., *How much is your personal data worth?*, FIN. TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u.

[19] *Id.*

[20] Pauline Glickman and Nicholas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[21] *Id.*

often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves. While a single social security number might go for $0.53, a complete health care records sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, health care breaches increased by 55% in 2020."[22]

90.     Moreover, health information has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[23]

91.     Given the existence of a market for the Medical Information disclosed by Defendant, Defendant has deprived Plaintiff and Class Members of the economic value of their Medical Information by disclosing such data without authorization and without providing proper consideration for Plaintiff's and other Class Members' property.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

92.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of the Meta Pixel into its website.

93.     The Meta Pixel and other tracking tools on Defendant's website were and are entirely invisible to a website visitor.

94.     Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

95.     Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

96.     Defendant had exclusive knowledge that its website incorporated the Meta Pixel and other tracking tools and yet failed to disclose to customers, including Plaintiff and Class Members, that by

---

[22] *How Much is Your Data Worth? The Complete Breakdown for 2021*, INVISIBLY.COM (July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/.

[23] Andrea Park, *How much should health data cost? $100K or more, according to patients*, Becker's Hosp. Rev. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

signing up for Defendant's Service through Defendant's website Plaintiff's and Class Members' Medical Information would be disclosed or released to Meta through the Pixel.

97.     Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Medical Information. Accordingly, Defendant is estopped from relying on any statute of limitations.

98.     Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

99.     The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## ALLEGATIONS SPECIFIC TO PLAINTIFF

100.     In or about November 2020, Plaintiff Jane Doe I visited BetterHelp's website, while in California, and signed-up for the Service. She used the Service from approximately November 2020 to November 2021, and she paid for the Service throughout that time.

101.     On information and belief, Plaintiff's Medical Information was disclosed to Meta.

102.     Plaintiff would not have used BetterHelp's website to sign up for the Service had she known that her Medical Information would be disclosed to unauthorized third parties.

103.     Plaintiff Jane Doe I believed that because she was on the website of a healthcare provider, her Medical Information would be protected and kept confidential.

104.     Plaintiff did not see anything on Defendant's website that suggested to her that her Medical Information would be disclosed or released to an unauthorized third party.

105.     Plaintiff Jane Doe I did not authorize, consent to, or otherwise encourage or permit the release of her Medical Information to Meta or any other third party.

## CLASS ACTION ALLEGATIONS

106.     Plaintiff brings this action, on behalf of herself and all others similarly situated, as a class action pursuant to Code of Civil Procedure § 382. Plaintiff seeks to represent a Class (whose members are "Class Members") composed of and defined as:

"All natural persons residing in California who used Defendant's website to sign up for Defendant's Service and whose Medical Information was disclosed or transmitted to Meta or any other unauthorized third party."

107.     Plaintiff reserves the right to revise or amend the above Class definition and to add subclasses based on facts learned in discovery.

108.     This action has been brought and may be properly maintained as a class action under the Code of Civil Procedure § 382 because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiff is a proper representative of the Class.

109.     <u>Numerosity</u>. The potential members of the proposed Class, as defined, are more than one hundred thousand, and so numerous that joinder of all members of the Class is impracticable.

110.     <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class. Plaintiff Jane Doe I used Defendant's website to sign-up for BetterHelp's Service and, on information and belief, her Medical Information was disclosed or transmitted to Meta or another unauthorized third party.

111.     <u>Commonality</u>. Common questions of fact and law exist as to all members of the Class and predominate over the questions affecting only individual members of the Class. These common questions include but are not limited to:

a.     Whether Defendant's acts and practices violated Plaintiff's and Class Members' privacy rights;

b.     Whether Defendant's acts and practices violated California's Constitution, Art. 1, § 1;

c.     Whether Plaintiff and Class Members had a reasonable expectation that their Medical Information would not be disclosed to third parties without authorization;

d.     Whether Defendant's acts and practices violated the California Confidentiality of Medical Information Act, Civil Code §§ 56 *et seq.*;

e.     Whether the Medical Information disclosed by Defendant constitutes "medical information" within the meaning of Civil Code § 56.05(i);;

f.     Whether Defendant obtained written consent to or permission for its conduct;

g.     Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Penal Code §§ 630, *et seq.*;

h.     Whether Defendant obtained express consent to or authorization for its conduct;

i.     Whether Defendant's acts and practices violated Business and Professions Code §§ 17200, *et seq.*;

j.     Whether Defendant's acts and practices harmed Plaintiff and other Class Members;

k.     Whether Plaintiff and other Class Members are entitled to equitable relief, including but not limited to, restitution and disgorgement;

l.     Whether Plaintiff and other Class Members are entitled to injunctive relief;

m.     Whether Plaintiff and other Class Members are entitled to damages and other monetary relief; and

n.      Whether Plaintiff and Class Members are entitled to reasonable attorneys' fees and costs.

112.    <u>Adequacy of Representation</u>. Plaintiff is a member of the Class and will fairly and adequately represent and protect the interests of the Class. Plaintiff's interests do not conflict with those of Class Members, she has no conflict of interest with other Class Members, is not subject to any unique defenses, and has retained competent and experienced counsel.

113.    <u>Superiority of Class Action</u>. Class action treatment is superior to any alternative to ensure the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single form simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendant, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Moreover, individual Class Members do not have a significant interest in controlling the prosecution of separate actions. Plaintiff anticipates no difficulty in the management of this action which would preclude its maintenance as a class action.

114.    Plaintiff reserves the right to add representatives for the Class, provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

## FIRST CAUSE OF ACTION

### Common Law Invasion of Privacy – Intrusion into Private Matters

115.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

116.    BetterHelp's secret disclosure of Plaintiff's and other Class Members' Medical Information, including each Class Member's email address, IP address, Facebook User ID, and other individually identifying information, and information about their medical history, mental and physical condition, and treatment (including that they were seeking mental health treatment), constitutes an intentional intrusion upon Plaintiff's and Class Members' private matters that were intended to stay private from third parties.

117.    Plaintiff and Class Members had a reasonable expectation of privacy in their Medical Information. Plaintiff and Class Members did not consent to, authorize, or have any reason to know about BetterHelp's intrusion into their privacy at the time it occurred.

118.    Defendant's intrusion into Plaintiff's and Class Members' private affairs, seclusion, and solitude, would be highly offensive to a reasonable person.

119.    Plaintiff and Class Members expected that the Medical Information they shared with a provider of healthcare would not be disclosed to an unauthorized third party. Social norms and industry standards inform the understanding that Medical Information is highly protected and that disclosure of that information to third parties requires consent and authorization. The secret disclosure of Medical Information would be highly offensive to a reasonable person.

120.    Plaintiff and Class Members have been harmed as a result of Defendant's actions, including by, but not limited to, an invasion of their privacy rights.

121.    Plaintiff and Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by BetterHelp as a result of its intrusions into Plaintiff's and Class Members' private matters.

122.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiff's and Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter BetterHelp from engaging in such conduct in the future.

123.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

124.    Plaintiff, on behalf of herself and the Class, requests relief as further described below.

## SECOND CAUSE OF ACTION

### Invasion of Privacy and Violation of California Constitution, Art. 1, § 1

125.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

126.    The right to privacy is enshrined in the California Constitution. Article 1, Section 1, provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

127.    Plaintiff and Class Members did not consent to or authorize BetterHelp to disclose their Medical Information to unauthorized third parties. Indeed, Plaintiff and Class Members had no knowledge

that such information was being so disclosed and, consequently, had no opportunity to deny consent or authorization.

128.    Plaintiff and Class Members had a reasonable expectation of privacy in their personal information, identities, and Medical Information pursuant to Article 1, Section 1, of the California Constitution, social norms, and the expectations of privacy that attach to relationships and communications with providers of healthcare.

129.    BetterHelp's disclosure of Plaintiff's and Class Members' Medical Information constitutes an intentional invasion of private communications, information, and matters, and an egregious breach of social norms.

130.    BetterHelp's conduct would be highly offensive to a reasonable person because the data disclosed was highly sensitive and personal, as protected by the California Constitution, and BetterHelp lacked consent or authorization to disclose such information.

131.    BetterHelp's violation of the privacy rights of thousands of Class Members, including Plaintiff, without authorization or consent, constitutes an egregious breach of social norms.

132.    Plaintiff and Class Members have sustained damages and will continue to suffer damages as a result of Defendant's invasion of their privacy.

133.    Plaintiff and Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by BetterHelp as a result of its intrusions into Plaintiff's and Class Members' private matters.

134.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiff's and Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter BetterHelp from engaging in such conduct in the future.

135.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

136.    Plaintiff, on behalf of herself and the Class, seeks relief as further described below.

///

### THIRD CAUSE OF ACTION

**Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.101**

137.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

138.   Cal. Civ. Code § 56.101(a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

139.   Section 56.101(a) further provides, in pertinent part: "Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

140.   BetterHelp is, and all relevant times has been, a "provider of health care" within the meaning of §§ 56.101(a) and 56.05(m).

141.   Plaintiff and Class Members are "patients" as defined by Cal. Civ. Code § 56.05(j).

142.   BetterHelp is a provider of health care who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information, within the meaning of §§ 56.101(a) and 56.05(i).

143.   BetterHelp failed to maintain, preserve, and store Plaintiff's and Class Members' medical information in a manner that preserves the confidentiality of the information contained therein because BetterHelp disclosed to Meta Plaintiff's and Class Members' Medical Information, as defined and described in this Complaint, including their first names, last names, and information about their medical histories, physical conditions, mental conditions, and treatments.

144.   BetterHelp's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at a minimum, negligent, and violates Civil Code § 56.101(a).

145.   Accordingly, pursuant to Cal. Civil Code § 56.36, Plaintiff and Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount to be determined at trial; and (3) statutory damages pursuant to Civil Code § 56.36(c); and (4) reasonable attorneys' fees and the costs of litigation.

146.   Plaintiff, on behalf of herself and the Class, seeks relief as further described below.

### FOURTH CAUSE OF ACTION

**Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10.**

147.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

148.    Cal. Civil Code § 56.10(a) prohibits a health care provider, such as BetterHelp, from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

149.    BetterHelp disclosed medical information without first obtaining authorization when it disclosed to Meta Plaintiff's and Class Members' Medical Information, as defined and described in this Complaint, including their first names, last names, and information about their medical histories, physical conditions, mental conditions, and treatments. No statutory exception applies. As a result, Defendant violated Civil Code § 56.10(a).

150.    BetterHelp knowingly and willfully disclosed Plaintiff's and Class Members' medical information without consent to Meta for financial gain. Namely, to market and advertise its services, or to allow others to market and advertise their services, in violation of Civil Code § 56.10(a).

151.    At the least, BetterHelp negligently disclosed Plaintiff's and Class Members' medical information in violation of Civil Code § 56.10(a).

152.    Accordingly, pursuant to Cal. Civil Code § 56.35 and 56.36, Plaintiff and Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Civil Code § 56.36(c); (4) punitive damages of three thousand dollars ($3,000) pursuant to § 56.35; and (5) reasonable attorneys' fees and the costs of litigation.

153.    Plaintiff, on behalf of herself and the Class, seeks relief as further described below.

## FIFTH CAUSE OF ACTION

**Violation of California Invasion of Privacy Act (CIPA), California Penal Code §§ 630, *et seq.***

154.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

155.    The California Invasion of Privacy Act begins with its statement of purpose: "The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state." Cal. Penal Code § 630.

156.    Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized

connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500) . . ."

157.    Defendant is a "person" within the meaning of Cal. Penal Code § 631.

158.    The Meta Pixel and Plaintiff's and Class Members' browsers, and Plaintiff's and Class Members' computing and mobile devices qualify as a "machine, instrument, contrivance or . . . other manner" under this statute.

159.    Plaintiff's and Class Members' communications of Medical Information with Defendant on and through Defendant's website were intended to be confined to the parties. Plaintiff and Class Members were using what they understood to be Defendant's secure Co-pay sign-up tool and secure website and no indication was given that their Medical Information would be shared with or viewed by any unauthorized third party. The circumstances reasonably indicate that Plaintiff and Class Members desired their communications with Defendant to be confined to the parties thereto.

160.    Despite not having any authorization from Plaintiff or Class Members, Defendant aided, agreed with, or conspired with Meta, to permit Meta to intercept these communications and to learn the content of those communications while in transit or in the process of being sent or received.

161.    Defendant's conduct, as described above, violated Penal Code § 631. Under Penal Code § 637.2, Plaintiffs and Class Members are entitled to recover the greater of: (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages according to proof at trial, as well as injunctive or other equitable relief.

162.    Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive Medical Information has been collected, viewed, accessed, stored, and used by Meta, and has not been destroyed. Due to the continuing threat of such injury, Plaintiff and Class Members have no adequate remedy at law and are entitled to injunctive relief.

Plaintiff and Class Members seek a permanent injunction under Penal Code § 637.2 enjoining Defendant from engaging in further conduct in violation of Cal. Penal Code § 630, *et seq.*

163.   Plaintiff, on behalf of herself and the Class, seek relief as further described below.

### SIXTH CAUSE OF ACTION

**Violation of California Business & Professions Code §§ 17200 *et seq*. (UCL)**

164.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

165.   The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of themselves and others similarly situated, who are affected by the unlawful, unfair, or fraudulent business practice or practices.

166.   BetterHelp's acts, omissions, practices, and non-disclosures as alleged herein constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq*. (UCL).

167.   Defendant engaged in "unlawful" business acts and practices, as set forth above: in violation of the common law; in violation of the California Constitution; and in violation of California statutes, including the Confidentiality of Medical Information Act and the California Invasion of Privacy Act.

168.   Plaintiff reserves the right to allege other violations of law committed by Defendant that constitute unlawful business acts or practices within the meaning of the UCL.

169.   Defendant has also engaged in "unfair" business acts and practices. California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data. BetterHelp violated this strong public policy by, among other things, surreptitiously disclosing, releasing, and otherwise misusing Plaintiff's and Class Members' Medical Information without Plaintiff's and Class Members' consent. BetterHelp's acts and practices violate the policies underlying the statutes and the article of the California Constitution referenced herein.

170.   Defendant's acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Defendant secretly disclosed, released, and otherwise misused Plaintiff's and Class Members' Medical Information, with no corresponding benefit to its affected customers. And, because consumers were unaware of Defendant's

incorporation of tracking tools into its website and that Defendant would disclose and release their Medical Information to unauthorized third parties, they could not have avoided the harm.

171.    Had Plaintiff and Class Members known that their Medical Information would be disclosed or released by Defendant to unauthorized third parties, they would not have shared their Medical Information with Defendant's website or would not have used Defendant's website.

172.    The UCL also prohibits any "fraudulent business act or practice." Defendant's above-described nondisclosures and misleading statements were false, misleading, and likely to deceive the consuming public in violation of the UCL.

173.    Plaintiff and Class Members suffered injury in fact and lost money or property as a result of Defendant's acts and practices in that a portion of any money Plaintiff and Class Members paid for Defendant's Service went to fulfill Defendant's obligations with respect to the confidentiality and security of Plaintiff's and Class Members' Medical Information, and Defendant failed to fulfill those obligations.

174.    Plaintiff and Class Members also suffered injury in fact as a result of Defendant's acts and practices because they paid more for Defendant's services than they otherwise would have had they known Defendant was disclosing their Medical Information to unauthorized third parties in violation of its legal obligations, social norms, and reasonable consumer expectations.

175.    Plaintiff and Class Members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) invasion of privacy; (ii) breach of the confidentiality of their Medical Information; and/or (iii) deprivation of the value of their Medical Information for which there is a well-established national and international market.

176.    Plaintiff seeks a declaration from the Court that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq*. under the unlawful, unfair, and fraudulent prongs of the UCL.

177.    Plaintiff also seeks restitution on behalf of herself and the Class.

178.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

179.    Plaintiff, on behalf of herself and the Class, seeks relief as further described below.

///

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and other Class Members, pray for judgment against Defendant as follows:

180.     Ordering that this action may proceed and be maintained as a class action under § 382 of the Code of Civil Procedure; and defining the Class as specified above and appointing Plaintiff as Representative of the Class and her attorneys as Counsel for the Class;

181.     Awarding Plaintiff and Class Members compensatory damages, disgorgement of profits, and punitive damages for Defendant's invasion of privacy and violation of Article 1, Section 1 of the California Constitution;

182.     Awarding Plaintiff and Class Members nominal damages of $1,000 per violation, or actual damages, and reasonable attorneys' fees and the costs of litigation, for Defendant's violations of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.101;

183.     Awarding Plaintiff and Class Members nominal damages of $1,000 per violation, or actual damages, punitive damages of $3,000 per violation, and reasonable attorneys' fees and the costs of litigation, for Defendant's violations of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.10;

184.     Awarding Plaintiff and Class Members statutory damages of $5,000 per violation, or three times the amount of actual damages, and injunctive relief for Defendant's violations of California's Invasion of Privacy Act, Penal Code §§ 630 *et seq*.;

185.     Declaring that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq*. under the unlawful, unfair, and fraudulent prongs of the UCL;

186.     Awarding Plaintiff and Class Members restitution for Defendant's violations of the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

187.     Awarding attorneys' fees and costs as authorized by statute and governing law, including Code of Civil Procedure § 1021.5; and

188.     Awarding such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

///

1

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and other members of the Class hereby demand a jury trial on all issues so triable.

DATED:   March 3, 2023                    Respectfully submitted,

/s/ Julian Hammond
Julian Hammond
*Attorneys for Plaintiff and the Putative Class*